```
 1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE NORTHERN DISTRICT OF TEXAS
 2                             FORT WORTH DIVISION

 3    UNITED STATES OF AMERICA        )    4:16-CR-124
                                      )
 4                                    )
      v.                              )    Sentencing
 5                                    )
      TERRY SHERO                     )    October 25, 2016
 6

 7
                      BEFORE THE HONORABLE REED C. O'CONNOR
 8                         United States District Judge
                              In Fort Worth, Texas
 9
      FOR THE GOVERNMENT:             MR. CHRIS WOLFE
10                                    US Attorney's Office
                                      Burnett Plaza Suite 1700
11                                    801 Cherry St Unit 4
                                      Fort Worth, TX 76102
12                                    817/252-5221
                                      Fax: 817-252-5455
13                                    Chris.wolfe@usdoj.gov

14    FOR THE DEFENDANT:              MS. PIA R. LEDERMAN
                                      Law Office of Pia R. Lederman
15                                    116 W Randol Mill Road
                                      Suite B
16                                    Arlington, TX 76012
                                      817/860-8888
17                                    Fax: 817/558-8890

18    COURT REPORTER:                 MR. DENVER B. RODEN, RMR
                                      United States Court Reporter
19                                    1050 Lake Carolyn Pkwy #2338
                                      Irving, Texas  75039
20                                    drodenrmr@sbcglobal.net
                                      Phone:  (214) 753-2298
21

22
          The above styled and numbered cause was reported by
23    computerized stenography and produced by computer.

24

25
```

1      (October 25, 2016.)

2          **THE COURT:**  If we could have Mr. Shero to come on

3   over.  And this will be case number 4:16-CR-124, the United

4   States versus Terry Shero.

5          **MR. WOLFE:**  Chris Wolfe for the Government.

6          **THE COURT:**  Thank you, Mr. Wolfe.  Ms. Lederman is

7   here.  Would you state your full name for the record.

8          **THE DEFENDANT:**  Terry William Shero.

9          **THE COURT:**  Shero.  Okay.  You have evidence you want

10  to present on these objections?

11         **MS. LEDERMAN:**  We do, Your Honor.  We have just to --

12  I know you are tired of us by now.  There was a Presentence

13  Report filed.  We filed our objections.  There was an Addendum

14  to the Presentence Report.  I mean, it's just I know Mr. Wolfe

15  has had issues with all the objections we have filed, but our

16  main issue on these objections is that if they are going to

17  write them down they need to be factually correct.  The main

18  issue has been the bulk of all of these sentences are

19  incorrect.  I mean, if we are going to talk about semantics

20  when they've got typos saying February of 2015 when it should

21  be February 2016.  When we are talking again, even in the PSR

22  Addendum, misstatements of what was in the actual offense and

23  citing weapons, ammunition, and amounts that were being pulled

24  from offenses that happened months later after my client had

25  already been incarcerated, so he has no connection to again

1  even the Addendum.  The paragraphs 12, 104, again they are

2  listing the exact same item that they sustained our objection

3  and said, yes, we were correct, yet in their Addendum we go

4  back and rely on those same items.  That also goes to

5  paragraph 22 of the Addendum where they are again listing

6  items which are factually incorrect for my client and which

7  are from another PSR on an arrest that happened two months

8  later all under a separate incident.

9      THE COURT:  Okay.  What do you say, Mr. Wolfe?

10     MR. WOLFE:  About -- I guess -- The Defense has

11  multiple objections, Your Honor.  I've tried to respond to

12  them in order I guess I'm unaware of exactly what she is

13  objecting to other than, you know, her -- or the Defense's

14  disfavoring of the PSR.  I don't know exactly which objection

15  we are referring to.

16     THE COURT:  What is it that needs to be corrected is

17  all --

18     MS. LEDERMAN:  Specifically, in paragraph 12 of the

19  Addendum to the PSR.

20     THE COURT:  Yes.

21     MS. LEDERMAN:  They list --

22     THE COURT:  The weapons.

23     MS. LEDERMAN:  -- the weapons.  They list them again

24  in paragraph 104.  They refer to these same weapons again in

25  paragraph 22.  They again refer to these same weapons and

1    ammunition in their request for a two level increase.  With

2    regard to the PSR and the Addendum and the State filing that

3    they have no objection, we are again asserting that everything

4    listed in the PSR and the PSR Addendum with regard to these

5    weapons were from an arrest that happened two months after my

6    client was incarcerated and in a different PSR belonging to

7    different individuals.

8          **MR. WOLFE:**  I think I can maybe help the Court.  Your

9    Honor, the PSR was correct in applying the two point

10    enhancement.  However, they listed the incorrect guns.  Those

11    guns listed in the PSR came from another offense report.  The

12    Government responded and on page two of the Government's

13    Responses of the PSR objections, the Government lists the

14    appropriate again guns and I believe the Addendum also lists

15    the correct guns.  I may be wrong about that.  Nevertheless, I

16    don't -- I don't believe the defendant is denying -- I guess

17    to be clear, Your Honor, I don't believe the defendant is

18    denying the enhancement or object to the enhancement, just

19    that the guns listed are incorrect.

20          **MS. LEDERMAN:**  And I guess that goes back to my

21    objection is I'm not going to agree to an enhancement when the

22    underlying supporting information is incorrect.  If you look

23    on the Addendum, paragraph 11 says seven weapons.  Paragraph

24    twelve says twelve weapons, yet it lists 20 weapons.  They

25    again are listing the exact same weapons that they sustained

1    our objection and said these are the incorrect weapons, so the

2    two level enhancement for a weapon my issue is if you're going

3    to do it, do it correctly.  The issue is --

4        THE COURT:  Well, let me ask this:  So, on page two

5    of the Government's Response they list seven weapons, the

6    Chipmunk, the Marlin, the Henry, the Remington, the

7    Winchester, the Ithaca, and the Springfield and those are

8    stated in the first -- the Response paragraph to the objection

9    to paragraph 12 in the Addendum.  So are those the right guns

10   or the wrong guns?  What is the objection?

11       MS. LEDERMAN:  Again, if you look though in their

12   Addendum, Judge, where they said we are now amending and

13   italicizing, page 11 -- paragraph 11 they've italicized and

14   said seven weapons.  But then if you look at paragraph 12 --

15       THE COURT:  I see.

16       MS. LEDERMAN:  They list the exact same weapons that

17   they just said are incorrect.  Then if you go to paragraph 104

18   they again list in the Addendum incorrect information.

19       If you go to paragraph 22 of the Addendum where again

20   in their response listing the incorrect --

21       THE COURT:  I see.

22       MS. LEDERMAN:  -- the incorrect information.  So our

23   objection goes to if you are going to give us a two level

24   enhancement and say this is why --

25       THE COURT:  Yes.  So I will -- I will sustain the

1   objection in part; that is, the firearms identified in the

2   paragraph that begins with the word "Response" on page 2 of

3   the Addendum, those firearms should be the firearms that are

4   listed in paragraph 12 and 104 on page 3 of the Addendum.

5        Now, those firearms then are the firearms that should

6   be used in the Response or referenced at least in the Response

7   to Roman -- that is detailed in Roman numeral VI of the

8   Addendum dealing with objection to paragraph 22.

9        Okay.  Any other objections?

10   **MS. LEDERMAN:**  And then again, Judge, on paragraph

11   22, have stricken the 2,310 rounds of ammunition because I

12   believe that's also incorrect.

13   **THE COURT:**  The -- That last paragraph should only

14   reference the firearms that I've just identified.

15   **MS. LEDERMAN:**  Okay.  Then again in that same --

16   **MR. WOLFE:**  Your Honor -- Your Honor, there wasn't

17   2300 rounds of ammunition.  There was just a few boxes of

18   ammunition.

19   **THE COURT:**  It doesn't matter.  I'm striking that

20   entire paragraph and that paragraph should read the weapons

21   identified on page 2 of the Addendum support a finding for an

22   enhancement.

23   **MR. WOLFE:**  Yeah.

24   **MS. LEDERMAN:**  And then again in the paragraph 104 of

25   the Addendum -- I'm sorry.  Did you've also say that would be

1    corrected?

2         THE COURT:  Both of them.  Paragraph 12 and 104,

3    which is on page 3.  I've already dealt with that.

4         MS. LEDERMAN:  Thank you.

5         THE COURT:  Those paragraphs, instead of those

6    firearms listed and italicized there, it should be the

7    firearms listed on page 2 of the Addendum.

8         MS. LEDERMAN:  And then again, Judge, they did not

9    respond, but in paragraph 15 of the original PSR, paragraph 12

10   of the original PSR, and paragraph 11 of the PSR we

11   alternately reference 9, 12, and 9 weapons, and then in the

12   Addendum they list 7 weapons.

13        THE COURT:  Well, the only weapons -- So I'm

14   sustaining your objection to references to weapons in the

15   Addendum.  The only references to weapons should be the

16   references to the weapons identified in this second paragraph

17   on page 2 of the Addendum.

18        MS. LEDERMAN:  Although I believe you've already

19   reviewed all of our other objections to the PSR, the other

20   objection we do have a proffer of evidence and then I believe

21   Mr. Danielson was still here and his client, Ms. Robin Meador,

22   who the bulk of the weight that is placed on my client, the

23   only weight placed on my client came from Ms. Meador and I

24   believe in paragraph 12 of the PSR the calculations came from

25   a discussion that the Government had with Ms. Meador that it

1    comes from paragraph -- lists paragraph 13 in the original

2    PSR, Judge.  That was our objection to 13 on an incorrect date

3    where it says February 29th, 2015.  I believe, again, that is

4    incorrect.  They did not meet until 2016 and in 2015 we can

5    show that Mr. Shero was incarcerated, so on paragraph 13 of

6    the PSR that is incorrect.  Paragraph 14 of the original PSR,

7    the Guideline computations which hold Mr. Shero accountable

8    for 889.15 grams, derived from 76 grams, and I believe the 76

9    grams all come from the proffer of ghosting from

10   Ms. Robin Meador.  And so with regard to her veracity and

11   credibility since that time we believe that Ms. Meador has

12   corresponded to my client indicating that she realizes -- she

13   doesn't recall making these statements to Mr. Brown and that

14   she no longer would support those statements as being true and

15   accurate, statements with regard to her and Mr. Shero and any

16   actual quantities between the two of them.  She has written

17   him numerous letters indicating that she basically lied and

18   she put this all on him.  She was trying to save herself and

19   trying to save whoever else she was involved with at that time

20   and that she basically said these things because she also

21   wanted to make sure he would be incarcerated so that he

22   wouldn't find another girlfriend and leave her.  We have

23   letter after letter after letter.  Ms. Meador is also here and

24   it goes to her credibility.  We don't deny -- I think my

25   client said the two encounters that they had, they did meet on

1    *Plenty of Fish*, they had an encounter one weekend and then

2    they did not have any other encounters until that next weekend

3    when he was arrested and Ms. Meador was arrested that second

4    time and then by his calculation and the letters we have from

5    Ms. Meador, they are talking about four to five ounces in her

6    letters and in her correspondence.  Ms. Meador says she

7    doesn't recall ever telling anyone and we've got her

8    credibility with -- we have this issue with every other day,

9    really what is every other day, can she be that specific and

10   that accurate for four weeks this was happening every other

11   day and then we have an issue with her credibility based on

12   her voluminous correspondence which we have for the Court.  I

13   don't have -- I'm sorry.  I didn't make copies and I have for

14   the Court and we would proffer it as Defendant's 1 all of her

15   correspondence -- I know her just from reading her name.  She

16   also mailed a letter to my office saying the same thing.  I'll

17   be happy to come testify.  You know, I don't know where these

18   numbers are coming from.  This was a four to five ounce at the

19   most and I would be happy to provide these to Court and we

20   would ask Ms. Meador be brought out and I understand after

21   talking to Mr. Danielson more than likely she would not --

22           **THE COURT:**  Mr. Danielson.

23           **MR. DANIELSON:**  Your Honor, I've talked to Ms. Meador

24   about these letters.  I just saw them this morning.  I advised

25   her not to testify.  She has agreed to that.  She is still

1   present in the back but she asked to remain back there but the

2   Court can do however you want with that.

3          THE COURT:  So you've advised her not to testify and

4   you said that she said what?

5          MR. DANIELSON:  She has agreed with me, that she

6   would not testify.

7          THE COURT:  She would invoke her Fifth Amendment

8   privilege?

9          MR. DANIELSON:  That's correct.

10          MS. LEDERMAN:  And --

11          MR. DANIELSON:  However, I will indicate to the

12   Court, and I've discussed this with her, I've discussed the

13   fact she has written letters and I've also asked her about the

14   specific letters now that I've seen them this morning and I do

15   believe those are her letters.  Those are letters that she in

16   fact did write.

17          THE COURT:  Okay.  Okay.  So, do you want me to call

18   her in and question her about her --

19          MS. LEDERMAN:  It's up to your, Judge.  Our issue

20   then with is regard to her -- the authenticity of these

21   letters.  She can authenticate the letters --

22          THE COURT:  Well, he stipulated that they are

23   authentic.

24          MS. LEDERMAN:  And as long as the Government has no

25   objection to that.

1          THE COURT:  Do you stipulate these are authentic?

2          MR. WOLFE:  Yes.  I've never read them, but I suspect

3     they are authentic.

4          THE COURT:  So do you want me to bring her out or

5     not?

6          MS. LEDERMAN:  No.

7          THE COURT:  Okay.  Okay.  Very good.

8          MS. LEDERMAN:  And, Judge, I believe that is the core

9     of our objection and our issues as to our other objections.  I

10    think that goes to the main issue that does to is the --

11         THE COURT:  Yes.

12         MS. LEDERMAN:  That is a huge variance in

13    calculations.  You saw her today.  You've knew when she got

14    arrested, she violated and continued to use drugs and she

15    tried to broker arms deals while basically was out on whatever

16    release she was on from her first arrest to her second arrest.

17    I think the issue of her credibility and her veracity is at

18    odds.  She is certainly somebody who by her own admission is

19    out there doing whatever she can to save herself and say

20    whatever she has to say to whoever she has to say, not to

21    mention the quantity of drugs she is using at the time.  The

22    issue of being able to come in and we take umbrage of being

23    able to say, yes, I know for exactly four weeks I was doing

24    every other day with this person and then immediately come

25    back and say, well, no, I don't even recall that.  I don't

1   recall that happening.  We all know that, I mean, I could

2   barely remember what I had for lunch yesterday nonetheless a

3   drug addict who can recall exactly what they were doing for a

4   five week -- four week period every other day.  I think that

5   goes to her credibility and she being able to say that, yes,

6   when my client has accepted responsibility --

7            THE COURT:  Let me just stop you there.  It sounds

8   like we need to hear evidence in this case and she is denying

9   through these letters these drug amounts, so the Government

10  will need to call --

11           MR. WOLFE:  Yes, Your Honor.

12           THE COURT:  -- Mr. Brown or somebody.

13           MR. WOLFE:  Yes, Your Honor.  If the Court will allow

14  at this time, the Government calls Officer Brown.

15           THE COURT:  Go ahead and have a seat there with the

16  marshal.  Have a seat.

17      (Witness sworn.)

18           MR. WOLFE:  May I begin?

19              **WITNESS NAME WITNESS,** was sworn

20                  **DIRECT EXAMINATION**

21  BY MR. WOLFE:

22  Q.  Would you please state your name and tell us what you do

23  for a living?

24  A.  My name is Kevin Brown.  I'm a criminal investigator with

25  the Tarrant County Criminal District Attorneys Office.  I'm

1  currently assigned to the Drug Enforcement Administration here

2  in Fort Worth, Texas, and have been since 1999.

3  Q.  Are you one of the case agents involved in the

4  investigation against Terry Shero?

5  A.  Yes, I am.

6  Q.  Are you familiar with Terry Shero?

7  A.  Yes, I am.

8  Q.  When did you first learn of Terry Shero?

9  A.  The day we first arrested Robin Meador.  I believe it

10  was April 21st.

11  Q.  Can you describe to the Court the circumstances upon which

12  you arrested Ms. Meador?

13  A.  We had made a number of purchases of narcotics from

14  Ms. Meador.  We received a federal arrest warrant for her and

15  we went and arrested her.

16  Q.  And upon her arrest did she agree to cooperate?

17  A.  Yes, sir, she did.

18  Q.  What, if anything, did she tell you?

19  A.  We asked her who she currently is receiving her

20  methamphetamine from and she told us Terry Shero.

21  Q.  Did you ask her specifics about how much methamphetamine

22  she had received from Mr. Shero and when that began?

23  A.  Yes, sir, we did.  We -- Of course, we did our normal

24  interview, how many methamphetamine you -- did you purchase

25  from him.  She told us approximately two ounces at a time.

1    How long have you known him.  She told us three to six weeks.

2    She talks about meeting him on *Plenty of Fish.com*.

3    Q.  What's *Plenty of Fish.com?*

4    A.  It's a type of dating site.  I have registered, so I don't

5    know, but that's what I was told.

6    Q.  She knew him three to six months?

7    A.  Three to six weeks.

8    Q.  I'm sorry.  Three to six weeks.  Excuse me.  And according

9    to her she was ordering approximately two ounces how often?

10   A.  Every other day.

11   Q.  Every other day.  Now, I assume in the past when you've

12   had situations to interview individuals that you have arrested

13   you are going to have to try to figure out whether or not they

14   are reliable or credible?

15   A.  Yes.

16   Q.  What did she tell you that you were able to I guess

17   corroborate?

18   A.  She told us his name.  She were able to do database

19   searches and found a Terry Shero.  We retrieved his

20   photograph.  Asked her if this is who she was talking about.

21   She said yes, but I can pull his *Facebook* page up so you can

22   see.  So she pulled his *Facebook.*  I compared the picture on

23   his *Facebook* page from with the picture that I received from

24   the Texas Department of Public Safety.  It was the same

25   person.

1    Q.  Did she also describe the location where he could be

2    located?

3    A.  Yes.  She told us that she had his phone number and that

4    he was currently staying in a motel off of Meacham and 35 in

5    Fort Worth, Texas.

6    Q.  At a Quality Inn?

7    A.  Value Inn or Quality Inn.  It was -- it was either Value

8    or Quality.

9    Q.  A hotel?

10   A.  Yes, sir.  A hotel.

11   Q.  So she identified him, she described his cell phone or

12   gave you the number of his cell phone.  Did you -- did she

13   also describe when the last time she saw him?

14   A.  Yes, sir, she did.  During this -- After we realized who

15   it was, we found out that he had two outstanding parole

16   warrants from the State of Texas, so we immediately started

17   making a plan to go try to arrest Mr. Shero.  We sent people

18   to the hotel that she had described to us.  We were able the

19   pull up a picture of the hotel off the internet.  We showed

20   her that picture and she said, Yeah, that's the hotel.  We

21   identified the hotel and we sent agents over to that hotel.

22   While we were talking to her she told us -- described two

23   vehicles Mr. Shero drove.  She told us where they would be

24   parked in the parking lot.  We sent the agents over.  They

25   verified that information and verified the hotel.  We then

1  took Meador over to the hotel.  She pointed out the room that

2  he was in.  We sent someone in or I believe I went in, if I

3  recall correctly, and determined what room number it was by

4  the room that she pointed at from the outside.  After we did

5  all this -- gained all this information, she told us that she

6  was in there the prior night, that she saw four ounces of

7  methamphetamine, that there were numerous guns laying on the

8  bed, and that basically the hotel room looked like a pawn

9  shop.

10 Q.  Had multiple --

11 A.  Clothes, cell phones, there was safe in there.  She

12 described the safe being in there.  That's where the meth

13 would be kept.  So we --

14 Q.  She gave you've information about what you would

15 eventually find in the hotel room?

16 A.  Yes, sir.

17 Q.  Okay.  And did you eventually attempt to make an arrest

18 and enter the hotel room?

19 A.  Yes, sir.  We -- after we verified what room we believed

20 it was, we went to another location and we had Ms. Meador make

21 a phone call to Mr. Shero, which she did.  Actually, there

22 were several phone calls.  He finally answered one of the

23 phone call.  At that time she told him she needed two ounces

24 of methamphetamine and that she would in need another two on

25 later that night.

1   Q.  Based on your training and experience, is it common for an

2   individual to be able to order two or four ounces of

3   methamphetamine from a source if she have not already done

4   that prior to that time?

5   A.  No.

6   Q.  So she did, in fact, make a phone call and order two to

7   four ounces?

8   A.  Yes.

9   Q.  And what was Mr. Shero's response?

10  A.  How much money do you have?

11  Q.  And what did she say?

12  A.  8 to 12.  Meaning 8 to $1200.

13  Q.  How much would 8 to $1209 pay for?  How much

14  methamphetamine --

15  A.  Two ounces.

16  Q.  -- would that -- Say that again?

17  A.  Two ounces.

18  Q.  What did you do with that information?

19  A.  We -- I believe she said, Okay.  I'll be there in a little

20  bit.  He told her that he wasn't there right now and that he

21  would be back shortly to the hotel.  We had agents sitting at

22  the hotel waiting when they saw him arrive.  They took him

23  into custody.  We approached, asked him for -- to search the

24  room.  He told us not.

25  Q.  He told you what?

1  A.  That he would not grant consent to search the room.

2  Q.  Okay.

3  A.  When we patted him down he had approximately 10 hotel card

4  keys on him.

5  Q.  Card keys?

6  A.  Yes, for the door.  It wasn't a traditional key; it was a

7  card key.  He refused consent, which was fine.  We took one of

8  the keys that we believed was a room key for I think it was

9  323.  I went up there because there was a lot of traffic in

10  and out of that room.  We opened the door to see if there was

11  anybody in the room, which there was not.  We shut the door

12  and then we posted a guard outside.  I went and obtained a

13  State of Texas search warrant for the motel room.  Once it was

14  signed we executed the warrant on the motel room.

15  Q.  And what did find inside the hotel room?

16  A.  Seven stolen guns, two -- approximately two ounces of

17  methamphetamine in a safe.  Numerous cell phones.  Probably 30

18  to 50 cell phones.

19  Q.  How did you access the safe?

20  A.  With the key that we retrieved from in Shero.

21  Q.  So in other words, the information that Ms. Meador gave

22  you was actually confirmed by what you saw in that motel room?

23  A.  Yes, sir.  She was exactly right.

24  Q.  Now, you also heard information, you've been in the

25  courtroom earlier when Ms. Lederman was talking about these

1    letters that have apparently gone back-and-forth between

2    Mr. Shero and Ms. Meador.

3    A.  Yes, sir.

4    Q.  You've read one of those?

5    A.  Yes, sir.

6    Q.  But you haven't seen the other ones?

7    A.  No, sir.

8    Q.  Let me ask you, based on your years of experience, is it

9    uncommon for an individual who has assisted authorities to try

10   to minimize what they have done for reasons such as they don't

11   want to be known as a snitch for fear.

12   A.  Yes, sir.

13   Q.  And/or they have some kind of relationship, romantic or

14   otherwise, with that person.  Is that -- Have you ever seen

15   that before?

16   A.  Yes, sir, I have.

17   Q.  As your sit here today do you believe Ms. Meador's

18   information which was given to you immediately upon her arrest

19   is reliable?

20   A.  Yes, I do.

21          MR. WOLFE:  That's all we have, Your Honor.

22                    <u>CROSS-EXAMINATION</u>

23   BY MS. LEDERMAN:

24   Q.  Can you tell the Judge how it was that you came into

25   contact with Ms. Meador the first time?

1    A.   We arrested her.

2    Q.   Had there been an ongoing investigation with regard to

3    Ms. Meador?

4    A.   Yes, ma'am.

5    Q.   Okay.  Can you tell the Judge about this ongoing

6    investigation?

7    A.   It was actually ran by the Department of Public Safety but

8    they had made previous narcotic buys from Ms. Meador.

9    Q.   They had also had several contacts with Ms. Meador prior

10   to her arrest on April 21st; correct?

11   A.   I don't -- What do you mean by contacts?

12   Q.   Well, do you recall an incident where the DPS had stopped

13   and did a welfare check because --

14   A.   Oh, yes, ma'am.  Yes.  I do recall --

15   Q.   Can you tell the Judge a little bit about some of these

16   prior contacts with Ms. Meador?

17   A.   Ms. Meador was with David Catlett I believe and a

18   Department of Public Safety trooper were following her to see

19   if they were conducting a narcotics transaction and they

20   started going towards Springtown I believe and I believe Mr.

21   Catlett and Ms. Meador were having an argument.  They flipped

22   the car around.  I believe it was her, I don't remember which

23   one, got out of the vehicle and walked off.  It might have

24   been her.  I don't recall.  And they approached, talked to

25   them, and did the -- didn't arrest them or anything --

1   Q.   They denied consent to search the vehicle and drove off:

2   A.   Okay.  I don't remember.

3   Q.   Would it be fair to say Ms. Robin Meador on the first

4   interview discussed numerous extensive drug dealing she had

5   with Mr. Catlett her boyfriend at the time?

6   A.   She discussed several people.  But Mr. Catlett, as far as

7   I recall, the day she got arrested, Mr. Catlett wasn't her

8   boyfriend at that time because I recall her telling us that

9   actually Mr. Shero was her boyfriend at that time.

10  Q.   And she had discussed that Catlett, she had received

11  narcotics from him, I believe.  The agents had also asked her

12  if the drugs she was dealing she was getting from these other

13  men in her life?  Is that correct?

14  A.   She had several sources, yes, ma'am, prior to, and she

15  kind of listed them out.  Is that what you are asking?

16  Q.   She had multiple sources; correct?

17  A.   Yes.  She basically had a source, she would lose that

18  source and get another source and she listed those sources out

19  in a time frame, as I recall.

20  Q.   And so Ms. Meador additionally says, Hey, I think I've

21  only known him maybe three to six weeks was her recollection?

22  A.   Yes, ma'am.

23  Q.   Then did you look at her cell phone or download her cell

24  phone?

25  A.   I -- I don't recall.  If we downloaded it, it would have

1   been given it on your discovery.

2   Q.  One of the things is I don't -- I do not see where there

3   was a phone dump of Mr. Shero's phone.  Was there a dump of

4   any of Mr. Shero's phone?

5   A.  I don't -- I don't recall.  I don't think there were.

6   Q.  So other than this phone call or these multiple phone

7   calls that Ms. Meador made on April 21st, these are the only

8   phone calls that we actually have knowledge of; correct?

9   A.  Well, that are recorded, yes, ma'am.

10  Q.  Then did Ms. Meador ever inform you that she also had been

11  given prior to that day a key to room 323?

12  A.  I don't believe so.

13  Q.  So if in the letters that we've provided the Judge she

14  says, you know, I did what was best for myself, I never told

15  him I had a key, would that also sound like somebody who was

16  trying to do what was best for them?

17  A.  Oh, yes, ma'am.

18  Q.  Did Ms. Meador ever tell you that she had been in -- and

19  you indicated to the Judge just a minute ago there was a lot

20  of traffic into room 323; correct?

21  A.  Yes, ma'am.

22  Q.  And there were multiple people that had access to that

23  room.

24  A.  I didn't say that.  I said multiple traffic.  The people

25  that we saw from the hallway, they did not have keys to that

1  room.

2  Q.  The keys that you found; correct?

3  A.  They did not because we checked all the keys they did have

4  against that room.

5  Q.  And were on all those other people under arrest?

6  A.  No.  They were cooperating.

7  Q.  Do we have any information about how reliable those people

8  are who you checked?

9  A.  No, ma'am.

10  Q.  All right.  So we don't know if they maybe had a key and

11  just didn't give it to you?

12  A.  I know that the keys that they had on them when we were

13  talking to them and they were talking to us did not fit room

14  323.

15  Q.  Now, with regard to Ms. Meador, can you tell the Judge

16  after the date of arrest, Mr. Shero is incarcerated; correct?

17  A.  Yes, ma'am.

18  Q.  After his incarceration Ms. Meador doesn't stop her drug

19  dealing, does she?

20  A.  I don't know if she was drug dealing.  I don't believe she

21  was.

22  Q.  Well, she was arrested again shortly after the middle of

23  May; correct?

24  A.  Yes, ma'am.

25  Q.  And not only is she arrested, she is arrested with trying

1   to broker a deal for a shipping container full of weapons?

2   A.  She was trying to middle a deal for weapons, yes, ma'am.

3   Q.  And we have already provided that entire proffer, the

4   arrest report to the Judge in our PSR and -- did you review

5   that?

6   A.  No, I haven't seen that.

7   Q.  And in that Ms. Meador upon her arrest on -- by the DEA on

8   May 23rd, were you aware of that?

9   A.  Are you talking about a gun deal?

10  Q.  Correct.

11  A.  Yes, ma'am.

12  Q.  So on May 23rd Ms. Meador is again arrested with a deal

13  involving guns and drugs again; correct?

14  A.  No.  Guns only.

15  Q.  So the drugs that were found in the containers and on all

16  the individuals who were arrested, those are not -- they're

17  not going to have any bearing on that with regard to

18  Ms. Meador?

19  A.  As I recall they weren't -- she wasn't -- where the drugs

20  were found were in vehicle that she never had any contact

21  with.

22  Q.  Basically, she was it still in contact with people and

23  around people who had access to drugs; correct?

24          THE COURT:  Well, sheer tested positive, so that's

25  kind of an obvious.

1      MS. LEDERMAN:  I wasn't aware --

2   BY MS. LEDERMAN:

3   Q.  So it's not like suddenly Ms. Meador was out of drugs that

4   supposedly because Mr. Shero was her source of supply?

5   A.  I don't doubt that at all that she had another source.

6   Q.  Now, with regard to Ms. Meador and her veracity, she also

7   indicated that -- did she ever tell you how at her first

8   proffer that she was able to broker arms deals?

9   A.  Okay.  Are you talking about a proffer or are you talking

10  about a post-arrest statement because her proffer interview

11  actually happened after the gun deal.

12  Q.  Correct.  I'm sorry.  In her initial post-arrest interview

13  from the April 21st arrest.

14  A.  Did she tell us --

15  Q.  Again.  We are talking about Ms. Meador's credibility;

16  correct?

17  A.  I understand.  Yes, ma'am.

18  Q.  On April 21st Ms. Meador is arrested; correct?

19  A.  Uh-huh.

20  Q.  After she had been the target of an ongoing drug

21  enforcement operation; correct?

22  A.  Yes, ma'am.

23  Q.  And then Ms. Meador is given an opportunity to then not

24  be -- not be arrested or released as long as she provides

25  information on other individuals; correct?

1   A.  Yes, ma'am.

2   Q.  Is it normal that people provide information on the people

3   that are tied to the least?

4   A.  No, ma'am.

5   Q.  Because if she had only known Mr. Shero for three weeks

6   she certainly had no strong ties to him; correct?

7   A.  I don't know.  She said they were dating.

8   Q.  For three, maybe six weeks at the most?

9   A.  Yes, ma'am.

10  Q.  Okay.  And these other individuals that she had talked

11  about in her post-arrest interview she talked about those were

12  individuals who she had children with, who she had a longer

13  relationship with.

14  A.  I don't recall children.

15  Q.  Okay.  Did you ever go on her *Plenty of Fish* website to

16  see when she made contact with Mr. Shero?

17  A.  I've never been on that website.

18  Q.  So when she said, Hey, this is how long I have known him,

19  I can pin point the date because this is how we met on this

20  website, you didn't have her pull up her profile?

21  A.  She didn't say that.

22  Q.  I'm sorry?

23  A.  She didn't say what you just said.  She said she met him

24  on *Plenty of Fish.com* and that was it.  I know nothing about

25  *Plenty of Fish.com*.

1    Q.   Okay.  Well, and just for purposes of did provide -- we

2    did pull up -- get on their website and pull off their

3    information off the website showing they did only met shortly

4    before the arrest on *Plenty of Fish.com.*  And did she indicate

5    to you how much access she had to the room at the hotel?

6    A.   She stated that she had been in there the night before and

7    she saw approximately four ounces of methamphetamine.

8    Q.   I understand what she saw.  Did she indicate to you that

9    she was in that room because she was going in and out because

10   she had a key or she was only there because somebody else was

11   with her?

12   A.   She was there to visit Mr. Shero.  That's what I recall.

13   Q.   I'm sorry?

14   A.   That's what I recall.

15   Q.   Did we talk to her specifically or is that just the

16   assumption we made as far as, hey, what she said she had been

17   there?

18   A.   I don't remember what specifically she was asked.  I

19   remember she was told me she was there to see Mr. Shero.  I

20   don't know if she told me that or I reached that conclusion.

21   Q.   Did you ask her if she ever saw any other individuals in

22   that room as well?

23   A.   Yes.  We did ask her and she said there was a lot of

24   traffic.  I don't think she specifically stated anybody by

25   name that she saw in that room specifically.  Specifically.

1   Q.  Okay.

2            MS. LEDERMAN:  Thank you.  Pass the witness.

3            THE COURT:  Anything else?

4            MR. WOLFE:  Just briefly, Your Honor.

5                    <u>REDIRECT EXAMINATION</u>

6   BY MR. WOLFE:

7   Q.  You met with Ms. Meador after for a proffer interview

8   sometime after she was arrested; correct?

9   A.  Yes, sir.

10  Q.  Did she essentially repeat information that she told you

11  on the day she was arrested?

12  A.  Yes, sir, she did.

13           MR. WOLFE:  That's all I have, Your Honor.

14           THE COURT:  Anything else?

15           MS. LEDERMAN:  No, Your Honor.

16           THE COURT:  Okay.  Any other evidence?

17           MS. LEDERMAN:  Not with regard to this.

18           THE COURT:  Very good.  I will overrule the drug

19  quantity objection.  It appears to me that the officer has

20  done a thorough job in questioning Ms. Meador and has found

21  information to corroborate statements that she has made and I

22  believe this is a reasonable estimate of the drug quantity

23  that would be appropriate in this case.  That being -- and

24  that the letters, while serious, and I wish I'd have known of

25  these letters when considering her sentence, that -- but --

1    but as the officer testified, based on his long history, that

2    that is not uncommon that they develop some remorse or develop

3    defense mechanisms and want to try to address those issues.

4         So that being the case then, subject to my ruling on

5    the firearms objections, I accept those objections accepted by

6    the Addendum and overrule those objections not accepted by the

7    Addendum, subject to my ruling on the firearms objections.

8         That being the case, then I adopt the fact -- Subject

9    to those rulings, I adopt the fact findings in those documents

10   and I adopt the Guideline calculations and determine that the

11   total offense level should be 31.

12        The Criminal History Category VI.

13        The imprisonment range 188 to 235 months.

14        Supervised release range of 3 years.

15        And a fine range of $30,000 to $1 million dollars.

16        Does the Government wish to be heard on sentencing?

17        **MR. WOLFE:**  No, Your Honor.  Thank you.

18        **THE COURT:**  I will turn the floor over to you for

19   your sentencing presentation.

20        **MS. LEDERMAN:**  You that, Judge.  And I would just

21   refer you back to our memorandum and I know you've had a very

22   busy morning, so just to briefly refresh your memory with

23   regard to the Sentencing Memorandum, I don't know what --

24        **THE COURT:**  He has had a horrible upbringing, as you

25   have outlined in the motion for variance and so thank you for

1      providing that to me in advance.

2          MS. LEDERMAN:  And, Judge, I don't even think I could

3      express to you after speaking to his mother for several hours

4      on the phone and as you can tell she wouldn't even be here

5      today.  I spoke to her.  I've never -- Given her mental health

6      illness, I don't think I could even express to you in this

7      letter or even today how little empathy I have for her and

8      little respect as far as how she has raised Mr. Shero on her

9      own one hand admission I guess due to circumstances of his

10     creation that she did not provide him any sort of motherly

11     support or empathy throughout his life.  She continued even

12     when I was speaking to her and blaming him for the ADD not

13     being a responsive child and not being a model child, when I

14     asked her about all the things that we listed that my client,

15     just a few things he was able to articulate witnessing, she

16     just kind of ignored those and said, Oh, well, you know,

17     that's just kind of -- I had no love and logic, I would have

18     made him responsible.  It just was absolutely mind-boggling.

19     When I tried to go through his history with her, the CPS, she

20     again said, Well, had he gone to school, you know, completely

21     ignoring her drug abuse, promiscuity, basically leaving him

22     home alone and basically raising himself on the streets.  When

23     I tried to address with her what happened when they moved to

24     Petaluma, California, basically was like, Well, you know, what

25     happens happens.  When I tried to address with her what in her

1   own mind leaving a 16 year old alone in another state was

2   appropriate she said was -- well -- there was none.  That

3   just -- she had a deal with herself and couldn't worry about

4   somebody else.  When I asked her about him coming book and

5   helping her, again, her responses was more sort of those were

6   his problems; that's not my responsibility.

7          I did also try and address with her daughter Wendy

8   who is the younger daughter who was Mr. Brown's child.  Again,

9   she did not provide any responses to that.  When I spoke to

10  her about Wendy's mental health and Wendy being in and out of

11  Wichita Falls and Rusk State Hospital sort of on a rotating

12  basis she just said, Well that's kind of Wendy.  And when I

13  asked her about Mr. Shero and Wendy's relationship, her

14  response was, Yes, Terry is the one who takes care of Wendy

15  and he can deal with Wendy and she kind of lives with Wendy

16  but that's sort of, you know, sort of their problem to deal

17  with.

18         We reached out on numerous occasions to his brother

19  Timber and I don't know if you were actually able to get on

20  YouTube and see Timber's interview discussing his upbringing

21  with his mother and father.  He did return our phone call at

22  one point in time and then when I tried to make contact with

23  him again he sort of has not be responsive to any of our

24  e-mails or text messages or responding to him.

25         Similarly, I spoke to Mr. Shero's sister and mother.

1  Sister is semi, I wouldn't say non-verbal, but not able to

2  speak or really take care of herself.

3       I spoke to mom and while mom is now stable and would

4  call on a regular basis, the phone calls become incoherent.

5  We would ask her repeatedly to come to the office.  We would

6  ask her if we could go get her and bring here to court today

7  and it was one of those, Sure, sure, sure, I'll call you back

8  and I will see what I ca do, I'm kind of busy, and we could

9  just never even make contact with her.

10      I mean, I think as we have seen, Mr. Shero has just

11  never been afforded any sort of -- I don't want to say break.

12  I mean, you want to talk about you just can't catch a break in

13  life, and I think this is it.  I mean, from day one he's never

14  had anybody to ever say you at some point in time, yes, you

15  have to take responsibility, this can't keep going on, but at

16  some point in time to be compassionate and be responsive to

17  this is what happens when the system repeatedly fails somebody

18  and I think we can see that from CPS, we can see that from his

19  family, whether it's in California, whether it was here,

20  whether it was in Iowa, has just been one system failure after

21  another.  He's never been able to address what happened to

22  Mr. Shero literally from birth, not to mention again the

23  father -- I will loosely use the term father.  The person who

24  created him and that whole incident with that person and

25  ultimately him -- yeah, dying while he was in custody in TDC,

having never had any contact with Mr. Shero, not that I think the Court would have allowed it.  I know I provided you some letters from Mr. Brown who is the purported had father figure on his own and if you just read those letters again you can just image if this is on sober Mr. Brown trying to be supportive you can only imagine what a twenty year old with a two year old who admits to being a raging alcoholic, a pill problem, and anger and violence issues.  So on that note when I was trying to speak to Ms. Shero about her time in California with Mr. Brown and Mr. Shero as a young child, she just became completely incoherent and it was like -- she was -- I cannot even express the horror to you.  Nothing I can tell you would even be able to tell you what was happening in that home.  Yes.  She ten seconds later she immediately says I'm not the one that divorced him, he divorced me, I believe in marriage.

When I asked Mr. Shero why he thinks Mr. Brown and his mother divorced he again said even at that age, I think his mother would have been twenty-one at the time, back to promiscuity, drug use, and just not even at that time, even for Mr. Brown, the raging alcoholic leaving them and going off and becoming an alcoholic for better or worse that she did finally tell Mr. Shero that Clinton Brown was not his father and she pulled Mr. Brown away from Terry only for her to be the primary caretaker.  And we are just going from one bad

1   situation to a worse situation, if that's at all possible.

2        I think Mr. Shero finally understands he can't do

3   this and ever have a productive life.  I mean, he's smart.  He

4   can -- He just has never been given the opportunity and

5   certainly locking him up and throwing away the key is just

6   repeating the cycle and repeating what has happened to him

7   since he started his life.

8        .  We understand that you've accepted Ms. Meador's

9   assertion for what was happening that day or -- the three week

10  relationship.  And I would turn it -- with that caveat, turn

11  it over to Mr. Shero.

12       THE COURT:  Very good.  Mr. Shero, do you wish to

13  speak in your behalf or present information in mitigation of

14  you sentence?

15       THE WITNESS:  Yes, sir.

16       THE COURT:  I would be pleased to hear from you.

17       THE DEFENDANT:  I've never in my life had a problem

18  accepting responsibility for any actions and that that's not

19  going to be any different today.  My only issue in accepting

20  responsibility here for something I did not do, I admit -- I

21  understand more than anybody the position Robin was in, in

22  fear for her life and wanting to save it.  I don't take

23  nothing from her, having gotten to know her and written her

24  these past few months.  I don't think she's a bad person.  I

25  just think she was trying to save her life.  Do I deny having

1    provided her with drugs?  No, sir, I do not.  Do I deny the

2    enhancement that's on there?  Absolutely.  If your were to

3    sequester all the letters between her and I, never in there

4    will you find once where I at any time tried to coerce her

5    into saying or doing anything.

6            And with that having been said, not once, I haven't

7    even told the girl I loved her in a letter and she would love

8    nothing more than to hear that.  I do think she is a good

9    woman.  I think she is just scared she made a mistake.  And

10   did I give her 29 ounces?  No.  Over that period, I wanted to

11   see her.  I wanted to get to know her.  In wanting to get to

12   know her I did what she wanted.  For three weeks about, four

13   weeks, we knew other we didn't talk.  We had an argument on

14   the phone.  I talked to her two days prior to having seen her

15   the night before the time in question.  That was the first

16   time I'd actually seen her after having talked to her two days

17   before and even weeks because of that argument.  I wish they

18   would have called her up here because I think her attorney

19   talked her into not getting up there.  I wasn't asking her or

20   whether I wanted her to get up there or not.  I don't think

21   she could have got up there and lied.  I think she would have

22   told the truth.

23           I do accept responsibility for any actions.  I am

24   sorry for what I did.  I go apologize to society as a whole

25   for anything that I have done.

1          That's all I have to say, Your Honor.

2          **THE COURT:**  Thank you.  I will now state the

3   determined pursuant to Title 18 U.S.C. Section 3553.

4          It is the judgment of the Court that the defendant is

5   committed to the Bureau of Prisons for a period of 144 months.

6   This is a downward variance based upon the Defense counsel's

7   motion.

8          This sentence shall run concurrent to any sentence

9   imposed out of Parker County and -- the 43rd District Court of

10  Parker County, the 43rd District Court in Parker County.

11         I do not order a fine.

12         I do order a mandatory special assessment of $100.

13         I also order a term of supervised release.  While on

14  release he shall comply with the standard conditions contained

15  in this judgment as well as the mandatory and special

16  conditions stated herein.

17         Have you gone over those conditions with your client?

18         **THE INTERPRETER:**  We have, Your Honor.

19         **THE COURT:**  I will order those conditions imposed in

20  this case.

21         Any objection from the Government?

22         **MR. WOLFE:**  No, Your Honor.

23         **THE COURT:**  Any objection from the Defense?

24         **MR. WOLFE:**  No, Your Honor.

25         **THE COURT:**  I will order this sentence imposed as

1    stated.

2         You have the right to appeal this sentence.  You also

3    have the right to apply for leave to appeal in forma pauperis

4    if you are unable to pay the cost of an appeal if you decide

5    to appeal your notice must be filed within 14 days.  Talk to

6    your counsel about your appellate rights.  Anything else?

7         MR. WOLFE:  No, Your Honor.

8         THE COURT:  Anything else?

9         MS. LEDERMAN:  No.  And just on behalf of Mr. Shero

10   and Goutreaux I think they all forget to ask you are they

11   getting their back time from when they were arrested.

12        THE COURT:  The Bureau of Prisons has to calculate

13   that.  I don't calculate it.

14        MS. LEDERMAN:  Not all the time but that they would

15   be given their credit.

16        THE COURT:  Yes.  I don't weigh in on that.

17        MS. LEDERMAN:  Okay.  Thank you, Judge.

18        THE COURT:  Very good.  We are in recess.

19        (Short recess.)

20        THE COURT:  I order a 3 year term of supervised

21   release and recommendation placement at Forrest City,

22   Arkansas.

23

24

25

1     I, **DENVER B. RODEN**, United States Court Reporter for the

2   United States District Court in and for the Northern District

3   of Texas, Fort Worth Division, hereby certify that the above

4   and foregoing contains a true and correct transcription of the

5   proceedings in the above entitled and numbered cause.

6       **WITNESS MY HAND** on this 7th day of December, 2016.

7

8

9                               /s/ Denver B. Roden

10                              **DENVER B. RODEN, RMR**
                                *United States Court Reporter*
11                              1050 Lake Carolyn Parkway #2338
                                Irving, Texas   75039
12                              *drodenrmr@sbcglobal.net*
                                **Phone:**  (214) 753-2298
13

14

15

16

17

18

19

20

21

22

23

24

25